# EXHIBIT 2

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

STRIVE

# Employment Agreement

This Employment Agreement (this "Agreement") is made and entered into as of August 2, 2022, by and between Joyce Rosely (the "Employee") and Strive Asset Management, LLC, an Ohio limited liability company (the "Company").

WHEREAS, the Company desires to employ the Employee on the terms and conditions set forth in this Agreement; and

WHEREAS, the Employee desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations set forth herein, but contingent upon Employee's successful completion of a background check, the parties agree as follows:

1. Term. The Employee's employment will commence as of August 2, 2022. The period during which the Employee is employed by the Company hereunder is referred to as the "Employment Term".

2. Position and Duties.

2.1 Position. During the Employment Term, the Employee will serve as Executive Vice President, Co-Head of Institutional Distribution. In such position, the Employee will have such duties, authority and responsibilities as may be determined from time to time by the Board of Directors of the Company (the "Board"), provided such duties, authority and responsibilities are consistent with the Employee's position.

2.2 Duties. During the Employment Term, the Employee agrees to devote substantially all of the Employee's business time and attention to the performance of the Employee's duties hereunder and will not engage in any other business, profession or occupation for compensation or otherwise that would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company. Notwithstanding the foregoing, the Employee will be permitted to own less than five percent of the publicly-traded securities of any corporation; provided that such ownership represents a passive investment and that the Employee is not a controlling person of, or a member of a group that controls, such corporation; and, provided, further that, these investments do not interfere with the performance of the Employee's duties and responsibilities to the Company as provided hereunder, including, but not limited to, the obligations set forth in this Section 2.

2.3 Place of Performance. The principal place of the Employee's employment will be as mutually agreed upon between the Company and the Employee and based on the Employee's assigned sales territory. In addition, the Employee may be required to travel on Company business during the Employment Term.

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

3. Compensation.

3.1 Base Salary. The Company agrees to pay the Employee an annual base salary of $250,000.00 in semimonthly installments in accordance with the Company's customary payroll practices and applicable wage payment laws. The Employee's annual base salary, as in effect from time to time, is hereinafter referred to as the "Base Salary".

3.2 Performance Bonus. In addition to the Base Salary, during the Employment Term, the Employee will be eligible to receive a periodic performance bonus (each, a "Performance Bonus") based on the Employee's performance in relation to criteria established from time to time by the Company with respect to the Employee's sales and sales management efforts on behalf of the Company Group. The initial amount and terms of the Performance Bonus are described in Exhibit A, which amounts and terms (as well as any future amounts and terms) will be subject to change from time to time in the sole and absolute discretion of the Company.

3.3 Equity Incentive Plan. The Employee will receive an Equity Award that will entitle the Employee to the number of Class B shares of the Company's parent, Strive Enterprises, Inc., an Ohio corporation (the "Parent"), that $1,000,000.00 could purchase at the time of the Parent's next Equity Financing (as defined in the Parent's standard 2022 Simple Agreement for Future Equity as it exists on the date hereof ("SAFE")) at a price per share as determined in said Equity Financing. For avoidance of doubt, "Equity Financing," as defined in the SAFE (and for these purposes), means a bona fide transaction or series of transactions that have the principal purpose of raising capital, that result in the conversion of the dollars invested in one or more SAFEs into shares of SAFE Preferred Stock (as defined in the SAFE), and pursuant to which the Parent also issues and sells Standard Preferred Stock at a negotiated price that may or may not be reflective of the Parent's then value.

3.4 Fringe Benefits and Perquisites. During the Employment Term, the Employee will be entitled to fringe benefits and perquisites consistent with the practices of the Company and governing benefit plan requirements (including plan eligibility provisions), and to the extent the Company provides similar benefits or perquisites (or both) to similarly situated employees of the Company.

3.5 Employee Benefits. During the Employment Term, the Employee will be entitled to participate in all employee benefit plans, practices and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), on a basis which is no less favorable than is provided to other similarly situated employees of the Company, to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

3.6 Vacation; Paid Time Off. During the Employment Term, the Employee will be entitled to paid vacation on a basis that is similar to that provided to other employees of the Company. The Employee will receive other paid time off in accordance with the Company's policies for employees as such policies may exist from time to time.

3.7 Business Expenses. The Employee will be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by the Employee in connection with the performance of the Employee's duties hereunder in accordance with the

Company's expense reimbursement policies and procedures. Business expenses are subject to audit and the Employee may be required to reimburse the Company for expenses that are determined to be in violation of the Company's policies and procedures. The Company may choose to disallow any expenses submitted by the Employee that do not conform to the Company's reimbursement policies.

3.8 Withholding. All amounts paid to the Employee under this Agreement during or following the Employment Term will be subject to withholding and other employment taxes imposed by applicable law. The Employee will be solely responsible for the payment of all taxes imposed on the Employee relating to the payment or provision of any amounts or benefits hereunder.

3.9 Clawback Provisions. Any amounts payable under this Agreement are subject to any policy (whether in existence as of the date hereof or later adopted) established by the Company providing for clawback or recovery of amounts that were incorrectly paid to the Employee. The Company will make any determination for clawback or recovery in its sole discretion and in accordance with any applicable law or regulation.

4. Termination of Employment. The Employment Term and the Employee's employment hereunder may be terminated by either the Company or the Employee at any time and for any reason; provided that, unless otherwise provided herein, each party agrees to give the other party at least 30 days' advance written notice of any termination of the Employee's employment. On termination of the Employee's employment during the Employment Term, the Employee will be entitled to the following compensation and benefits and will have no further rights to any compensation or any other benefits from the Company or any of its affiliates (collectively, the "Company Group"): (a) any accrued but unpaid Base Salary and Performance Bonus, and accrued but unused vacation which will be paid on Company's ordinary payroll date immediately following the date of termination in accordance with the Company's customary payroll procedures; (b) reimbursement for unreimbursed business expenses properly incurred by the Employee, which will be subject to and paid in accordance with the Company's expense reimbursement policy; and (c) such vested employee benefits (including equity compensation), if any, to which the Employee may be entitled under the Company's employee benefit plans as of the date of termination. In no event will the Employee be entitled to any payments in the nature of severance or termination payments.

5. Cooperation. The parties agree that certain matters in which the Employee will be involved during the Employment Term may necessitate the Employee's cooperation after the Employment Term. Accordingly, following the termination of the Employee's employment for any reason, to the extent reasonably requested by the Company, the Employee agrees to reasonably cooperate with the Company in connection with matters arising out of the Employee's service to the Company; provided that, the Company agrees to make reasonable efforts to minimize disruption of the Employee's other activities. The Company agrees to reimburse the Employee for reasonable expenses incurred in connection with such cooperation.

6. Confidentiality.

6.1 Confidential Information. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations,

pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company Group or any of their respective businesses, or of any other person or entity that has entrusted information to the Company Group in confidence. The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Employee understands and agrees that Confidential Information includes information developed by the Employee in the course of employment by the Company Group as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information does not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or anyone acting on the Employee's behalf.

6.2 Duty of Confidentiality. The Employee acknowledges that during the Employment Term, the Employee will have access to and learn about Confidential Information. The Employee acknowledges the confidential and proprietary nature of the Confidential Information and agrees that, except to the extent required to perform his or her duties in the course of employment by the Company, the Employee will (a) keep the Confidential Information confidential, (b) not use the Confidential Information for any reason or purpose, and (c) without limiting the foregoing, not disclose the Confidential Information to any individual or entity, except with the Company's prior written consent.

6.3 Permitted Disclosures. If the Employee becomes compelled by a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation to make any disclosure that is prohibited by this Agreement, the Employee agrees, to the extent legally permissible, to provide the Company with prompt notice of such compulsion so that the Company may seek an appropriate protective order or other appropriate remedy or waive compliance with the provisions of this Section 6. In the absence of a protective order or other remedy, the Employee may disclose only that portion of the Confidential Information that the Employee is legally compelled to disclose; provided, however, that the Employee agrees to use his or her best efforts to obtain written assurance that any individual or entity to whom any Confidential Information is so disclosed will afford confidential treatment to such Confidential Information.

6.4 Permitted Communications. Nothing herein prohibits or restricts the Employee (or the Employee's attorney) from initiating communications directly with, responding to an inquiry from, or providing testimony before the Securities and Exchange Commission (SEC), the Financial Industry

Regulatory Authority (FINRA), any other self-regulatory organization, or any other federal or state regulatory authority.

6.5 Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA"). Notwithstanding anything to the contrary herein: (a) the Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that (i) is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed under seal in a lawsuit or other proceeding. If the Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Employee may disclose the Company's trade secrets to the Employee's attorney and use the trade secret information in the court proceeding if the Employee (A) files any document containing trade secrets under seal, and (B) does not disclose trade secrets, except pursuant to court order.

6.6 Duration. The Employee acknowledges that the Employee's obligations under this Agreement with regard to any particular Confidential Information commenced immediately upon the Employee first having access to such Confidential Information (whether before or after the Employment Term) and will continue during and after the Employee's employment by the Company until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or anyone acting on the Employee's behalf.

7. Restrictive Covenants.

7.1 Acknowledgement. The Employee understands that the nature of the Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company Group. The Employee acknowledges that the services the Employee provides to the Company Group are unique, special, or extraordinary. The Employee further acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company Group is of great competitive importance and commercial value to the Company Group, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity.

7.2 Non-Competition. The Employee agrees that, for so long as he or she is employed by any member of the Company Group and for the three-month period beginning on the last day of the Employment Term (the "Restricted Period"), regardless of the reason for the termination and whether employment is terminated at the option of the Employee or the Company, the Employee will not, without the prior written consent of the Board, anywhere in the United States (the "Restricted Area"), directly or indirectly, on your behalf or on behalf of any other person, firm, corporation, association or other entity, as an employee, director, advisor, partner, consultant or otherwise, provide services or perform activities for, or acquire or maintain any ownership interest in, any business that engages in any activity, or owns or controls a significant interest in any entity that engages in any activity, that, in either case, is similar to any activity in which the Company Group is engaged at any time during the Employment Term (the "Restricted Business"); provided, however, that, for the purposes of this Agreement, ownership of voting securities having no more than five percent of the outstanding voting power of any individual or entity engaged in the Restricted Business that is listed on any national securities exchange or traded actively in a national over-the-counter market will not be deemed to be in violation of this Agreement so long as the Employee has no other connection or relationship with such individual or entity. The Employee agrees that his or her engagement in the Restricted Business within the Restricted Area during the Restricted Period would harm

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

or damage the legitimate business interests of the Company Group, and would confer an unfair advantage on the Employee.

7.3 Non-Solicitation. The Employee agrees that, during the Restricted Period, he or she will not, directly or indirectly, without the prior written consent of the Company, (i) solicit, request, advise or otherwise influence any Client (as defined below) to patronize any Restricted Business in which the Employee is engaged, or to withdraw, curtail, cancel, disturb, decrease, interfere with, jeopardize or otherwise adversely modify any such Client's business with the Company Group, or (ii) solicit, divert or hire, attempt to solicit, divert or hire or induce or cause to be diverted or hired a current employee, officer, director, agent, or other person or entity employed by or engaged to perform services on behalf of the Company Group in the six-month period immediately prior to the date of such solicitation, attempted solicitation or inducement, whether or not such employee or former employee is or was a full-time employee or a temporary employee of the Company Group, and whether or not such employment is or was for a determined period or at-will. For purposes of the foregoing, a "Client" is any client or prospective client of the Company Group for whom the Employee provided services or transacted business, or for whom the Employee knew (or should reasonably have known) that other employees of the Company Group had provided services or transacted business; provided that, to be a "prospective client" for purposes of this definition, the Company Group must have made a written presentation or proposal to such prospective client during the 12-month period preceding the end of the Employment Term or was otherwise preparing to make such written presentation or proposal at the time the Employment Term ended.

7.4 Non-Disparagement. The Employee agrees that he or she will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company Group or any of its employees; provided, however, that the foregoing does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, as long as that compliance does not exceed that required by the law, regulation or order.

7.5 Notice to Future Employers. During the Restricted Period, within ten days after the Employee entering into an employment, consulting, independent contractor, partnership, or other business association with any individual or entity, the Employee agrees to notify the Company of the identity and address of such individual or entity. The Company may notify each such individual or entity that the Employee is bound by the terms of this Agreement and may furnish each such individual or entity with a copy of applicable provisions of this Agreement.

8. Proprietary Rights.

8.1 Work Product. The Employee agrees that all right, title and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by the Employee individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research or development of the Company Group or result from any work performed by the Employee for the Company Group (in each case, regardless of when or where prepared or whose equipment or other resources is used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

(collectively, "Work Product"), as well as any and all rights in and to U.S. and foreign (i) patents, patent disclosures and inventions (whether patentable or not), (ii) trademarks, service marks, trade dress, trade names, logos, corporate names, domain names and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable works (including computer programs) and rights in data and databases, (iv) trade secrets, know-how, and other confidential information, and (v) all other intellectual property rights, in each case, whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "Intellectual Property Rights"), will be the sole and exclusive property of the Company.

8.2 Work Made for Hire; Assignment. The Employee acknowledges that, by reason of being employed by the Company Group, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement will be construed to reduce or limit the Company's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

8.3 Further Assurances; Power of Attorney. During and after the Employment Term, the Employee agrees to reasonably cooperate with the Company to (i) apply for, obtain, perfect and transfer to the Company the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as may be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in the Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, prosecution, issuance, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company may have in such circumstances by operation of law). The power of attorney is coupled with an interest and will not be affected by the Employee's subsequent incapacity.

8.4 No License. The Employee understands that this Agreement does not, and may not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to the Employee by the Company Group.

9. Security.

9.1 Security and Access. The Employee agrees: (a) to comply with all Company security policies and procedures as in force from time to time; (b) not to access or use any facilities or technology resources or systems of the Company Group except in the course of providing services to the Company Group or as otherwise authorized by the Company; and (c) not to access or use any facilities or

technology resources or systems of the Company Group in any manner after the end of the Employment Term, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event the Employee learns of any violation of the foregoing restrictions by any other person or entity, or of any other misappropriation or unauthorized access, use, reproduction or reverse engineering of, or tampering with any facilities or technology resources or systems of the Company Group.

9.2 Exit Obligations. Upon (a) voluntary or involuntary termination of the Employee's employment or (b) the Company's request at any time during the Employee's employment, the Employee agrees to (i) provide or return to the Company any and all Company property and all Company documents and materials belonging to the Company Group and stored in any fashion, including, but not limited to, those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company Group or created by the Employee in connection with the Employee's employment by the Company, and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company Group devices, networks, storage locations or media in the Employee's possession or control.

10. Representations of the Employee. The Employee represents and warrants to the Company that: (a) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement or understanding to which the Employee is a party or is otherwise bound; and (b) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition or other similar covenant or agreement of a prior employer.

11. Miscellaneous Provisions.

11.1 Reasonable Restrictions. The Employee agrees that the restrictions contained in this Agreement are reasonable in scope and duration and are necessary to protect the Company Group and its legitimate business interests, and to prevent an unfair advantage from being conferred on the Employee. If any of the provisions set forth in this Agreement as applied to any party or to any circumstance, is adjudged by a court to be invalid or unenforceable, such provision will in no way affect any other circumstance or the validity or enforceability of the remainder of this Agreement. If any provision of this Agreement, or any part thereof, is held to be unenforceable because of the duration or scope of such provision or the area covered thereby, the Employee agrees that the court making such determination will have the power to modify the offending provision in accordance with Section 11.8.

11.2 Equitable Relief. The Employee agrees that the breach of any of the terms of this Agreement, will cause irreparable injury to the Company Group and its legitimate business interests, that the Company Group could not be adequately compensated by monetary damages alone, and that the Company's remedy at law would not be adequate. Therefore, the Employee acknowledges that in the event of a breach of any of the provisions set forth in this Agreement, the Company will be entitled, in addition to any other remedy at law or in equity to which the Company may be entitled, to equitable relief against the Employee, including but not limited to specific performance of the Employee's obligations pursuant to this Agreement, temporary restraining orders and preliminary and permanent injunctions to restrain the Employee from breaching the terms of this Agreement and to compel compliance with the Employee's obligations under this Agreement.

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

11.3 Publicity. The Employee irrevocably consents to any and all uses and displays by the Company Group and its licensees of the Employee's name, voice, likeness, image, appearance and biographical information in, on or in connection with any pictures, photographs, audio and video recordings, digital images, websites, television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate commercial and business purposes of the Company ("Permitted Uses") without further consent from or royalty, payment, or other compensation to the Employee. The Employee hereby forever waives and releases the Company Group and its directors, officers, employees and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, arising directly or indirectly from the Company Group's and its licensees' exercise of their rights in connection with any Permitted Uses.

11.4 Notice. Notices and all other communications provided for in this Agreement must be in writing and delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

Strive Asset Management, LLC
1822 Henderson Road
Unit 20790
Columbus, OH 43220
Secretary of the Company

If to the Employee:

Joyce Rosely
460 Hillside Ave
Westfield, NJ 07090

11.5 Governing Law: Jurisdiction and Venue. This Agreement, for all purposes, will be construed in accordance with the laws of the State of Ohio without regard to conflicts of law principles. Any action or proceeding by either of the parties to enforce this Agreement must be brought only in a state or federal court located in the State of Ohio. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

11.6 Entire Agreement. This Agreement contains all of the understandings and representations between the Employee and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

11.7 Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and the Company. No waiver by either of the parties of any breach by the other party hereto of any condition

or provision of this Agreement to be performed by the other party will be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor will the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

11.8 Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement is held as unenforceable and thus stricken, such holding will not affect the validity of the remainder of this Agreement, the balance of which will continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

11.9 Captions. Captions and headings of the sections of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section.

11.10 Counterparts. This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Signatures delivered by electronic means will have the same force and effect as manual signatures delivered in person.

11.11 Tolling. Completion of the Restricted Period will be tolled during the time of any activity prohibited by this Agreement. In the event a court grants injunctive relief to the Company for a failure of the Employee to comply with this Agreement, the Restricted Period will resume with the date such relief is granted, with credit given for only that portion of the Restricted Period during which the Employee as in full compliance herewith.

11.12 Successors and Assigns. This Agreement is personal to the Employee and may not be assigned by the Employee. Any purported assignment by the Employee will be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company. This Agreement will inure to the benefit of the Company and permitted successors and assigns.

11.13 Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties will survive such expiration or other termination to the extent necessary to carry out the natural meaning and intent of the provisions hereof.

11.14 Full Understanding. THE EMPLOYEE ACKNOWLEDGES THAT THE EMPLOYEE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES THAT THE EMPLOYEE HAS HAD AN

OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

*[this space left blank intentionally – signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

STRIVE ASSET MANAGEMENT, LLC

DocuSigned by:
By: Benjamin Pham
3AC2AE0EB9664CC...
Name: Benjamin Pham
Title: Chief Financial Officer

EMPLOYEE

DocuSigned by:
9CD3CE700306444...
Name: Joyce Rosely

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

**Exhibit A**

**Initial Performance Bonus Plan (the "Plan")**
**(subject to review and revision by the Company at any time)**

Commencing with the Company's fiscal quarter that starts on October 1, 2022 and continuing for the next eight fiscal quarters thereafter during the Employment Term (the "Performance Period"), the Employee will be eligible to receive a quarterly (four times per year) performance bonus (each, a "Performance Bonus"), if earned, based on the Employee's performance in relation to criteria established from time to time by the Company with respect to the Employee's sales and sales management efforts on behalf of the Company Group. During each quarter of the Performance Period, the Employee's target Performance Bonus will be $125,000.00 (or $500,000.00 annualized). Each Performance Bonus will be paid by the Company no later than 30 days following the end of the quarter of the Performance Period for which it was earned. The Performance Bonus for any partial period during the Employment Term will be prorated based on the number of days of such period that occur within the Employment Term. For the avoidance of doubt, the Employee will no longer be eligible to receive a Performance Bonus with respect to any fiscal quarter of the Company after the quarter ending September 30, 2024, unless the Company and the Employee agree in writing to a mutually acceptable extension or revision of this Plan.

The initial criteria that the Employee's performance will be evaluated against, for the purposes of determining the Performance Bonus, will be as follows:

1. Asset Growth. As a member of the Company's sales organization ("Sales Organization"), the Employee will be primarily responsible for growing the amount of invested funds brought under management by the Company Group ("AUM"). The Company and the Employee will set AUM growth goals relating to the institutional sales channel, as distinct from the wealth management, registered investment advisor, high-net worth sales or retail investor (for these purposes, retail investors include individuals who trade on discount brokerages, including but not limited to, Fidelity, Charles Schwab, Robinhood, TD Ameritrade, E*Trade, etc.) channels, that the Employee will be responsible for achieving.

2. New client acquisition. The Employee will be responsible for securing new clients for the Company Group and bringing in new AUM from these new clients into the Company's funds.

3. Sales Activity. The Employee will be evaluated on objective sales activity, e.g., number and frequency of sales calls, meetings, lead generations, etc. The Employee will be responsible for designing, implementing, updating, managing, and overseeing a sales activity tracking system that will be integrated into the Company's customer relationship management system.

4. Sales Management. As Executive Vice President, Co-Head of Institutional Distribution, the Employee will be a member of the Sales Organization's leadership team and the Company's management team. The Employee will be expected to collaborate with key executives of the Company, including but not limited to, the Company's Chief Executive Officer, Chief Financial Officer, etc. and other similarly situated Executive Vice Presidents within the Sales Organization. The Employee's responsibilities within the Sales Organization will include, designing and overseeing sales processes, procedures, paperwork, workflows, marketing material, compensation policies, etc. The Employee's responsibilities

DocuSign Envelope ID: 43EA33F5-52A5-4115-AADB-D0168BA7C58C

within the Company Group will include collaborating with the Company Group's Product and Investments team on new product design and launches, and actively participating in the recruitment of both new members of the Sales Organization and other employees and consultants of the Company Group.